***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Chapman, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award, with some modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission.
2. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
3. The employer-employee relationship existed between defendant-employer and plaintiff.
4. The employer/defendant is self-insured and their workers' compensation coverage is managed by their servicing agent, Zurich American Insurance.
5. There is no question as the misjoinder or nonjoinder of the parties, and the parties are properly before the Industrial Commission.
In addition, the parties stipulated into evidence the following:
1. Packet of Industrial Commission forms.
2. Medical records and reports.
3. W-2 earning statements.
4. Form 22 that was submitted after the hearing.
The Pre-Trial Agreement dated April 8, 2004, which was submitted by the parties is incorporated by reference.
 ***********
Based upon all the evidence adduced from the record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff, who was fifty years old at the time of the hearing before the Deputy Commissioner, began working for defendant in 1990. The company manufactured tapes, cassettes, and, later, DVDs. Plaintiff held various jobs for the company but as of 1992 her positions were in the warehouse, where she worked twelve-hour shifts. Her last job in the warehouse involved pulling supplies and issuing them to the mechanics. She used a forklift, which she stood on to operate, and spent much of her shift on a cherry picker. The job required her to be on her feet while she was working, but she was given two fifteen-minute breaks and a thirty-minute lunch period.
2. In approximately 1997 the company implemented a policy requiring all warehouse workers to wear steel-toed shoes. Thereafter, plaintiff wore them at work. They were not as comfortable as the athletic shoes she had previously worn and did not provide her with as much foot support.
3. During the late 1990's, plaintiff began to develop pain in her feet. The pain worsened to the point that on May 9, 2001 she went to Dr. Waldman, a podiatrist. He had x-rays taken that revealed bone spurs on her heels, increased calcaneal inclination, and an enlarged first metatarsal head. Dr. Waldman diagnosed her with bilateral plantar fasciitis. He injected both of her heels with a cortisone solution, gave her shoe inserts to use, and prescribed medication. Her symptoms persisted despite the treatment. In fact, they appeared to worsen. She called his office on May 21 reporting that she simply could not tolerate the constant standing and walking required by her job. Consequently, he took her out of work at that time.
4. On June 1, 2001 Dr. Waldman performed surgery to plaintiff's left heel to remove the bone spur and to release partially the insertion of the ligament. He subsequently injected her foot again and kept her from bearing weight on it until July 9, 2001. In August after she was off of crutches completely, he ordered physical therapy. Despite this treatment, plaintiff remained symptomatic, so, on October 22, 2001, Dr. Waldman performed extra corporeal shock wave therapy to the foot. The procedure did not relieve her symptoms. Consequently, on January 18, 2002 the podiatrist tried one more operative procedure where he removed a calcific lesion and some soft tissue from the left heel. After allowing approximately two months for the foot to heal, he then allowed her to return to work on a part-time basis.
5. Plaintiff subsequently returned to work for defendant-employer at six hours per day but found that the standing and walking required by her job caused intolerable pain. Her pain appeared to be out of proportion to her findings and Dr. Waldman became concerned that she might be showing signs of reflex sympathetic dystrophy. He therefore took her back out of work. Plaintiff did not improve sufficiently so that she could go back to work, so Dr. Waldman subsequently recommended that she be evaluated by Dr. Mangone, an orthopedic surgeon.
6. When plaintiff initially began treating with Dr. Waldman, she did not relate her foot problems to her work duties, but at some point she told him that she had to stand and walk on concrete floors for twelve-hour shifts during her employment in the warehouse. Dr. Waldman had no record of her telling him about wearing steel-toed shoes. Plaintiff did complain about the shoes generally to her supervisor before she saw the doctor, but it did not appear that she related her foot problems to wearing steel toed shoes until well after she began receiving medical treatment.
7. After learning that plaintiff was claiming that her foot problems were work related, defendants sent her to Dr. Broadhurst for evaluation. He examined her on July 31, 2002. She told him that she had slowly developed bilateral foot pain over the years and she attributed the pain to working twelve-hour shifts involving standing on concrete floors while wearing steel-toed shoes. She also complained of back pain that she said Dr. Waldman had told her was probably due to her altered gait. Dr. Broadhurst concurred with the diagnoses of plantar fasciitis and back pain due to altered ambulation. He also thought that she was showing signs of depression. In his opinion, her bilateral plantar fasciitis was related to prolonged standing on hard surfaces for years. He did not believe that she would be able to return to work in her former position, although she was capable of sedentary work.
8. At the referral of Dr. Waldman, Dr. Mangone, an orthopedic surgeon, examined plaintiff on October 21, 2002. She still complained of severe pain in both heels and in the lateral midfoot areas of her feet when she saw him. On examination, she was hypersensitive, with pain out of proportion to the physical findings. Dr. Mangone considered various potential causes for the hypersensitivity, including a generalized neuropathy, reflex sympathetic dystrophy, or a condition such as fibromyalgia. He recommended laboratory tests and a bone scan. Plaintiff then underwent the testing and returned to the doctor on November 1, 2002. The tests had revealed an elevated sedimentation rate and slight uptake at the right heel on the bone scan. Dr. Mangone did not see specific joint or bony abnormalities, so he recommended that she be evaluated by a rheumatologist.
9. Plaintiff subsequently returned to Dr. Waldman on July 31, 2001. She advised him that she was living on Celebrex, that she continued to experience significant pain in both feet and that her feet would turn bluish-red and would feel cold. In view of her complaints, Dr. Waldman diagnosed her with reflex sympathetic dystrophy and referred her for pain management. Dr. Leogrande then began treating plaintiff in August 2003.
10. Plaintiff was never released to return to work in her former capacity, and defendant-employer terminated her employment after she had been out of work for a year.
11. Plaintiff filed this claim because her foot pain developed while she was working twelve-hour shifts in a job that required constant standing and walking while wearing steel-toed shoes. However, the medical evidence submitted established that plantar fasciitis is a common condition found in the general population and, although prolonged standing and walking can exacerbate the condition, there is no known causal relationship between such activities and the development of plantar fasciitis, which can easily develop in people who have jobs requiring them to sit all day. Footwear has also not been shown to be a causal factor.
12. Despite the fact that plaintiff worked on her feet for twelve-hour shifts wearing steel-toed shoes during her employment with defendant-employer, plaintiff has not met her burden of proving that she was placed at an increased risk of developing plantar fasciitis as compared to the general public not so employed. Furthermore, plaintiff has not met her burden of proving that her working conditions caused her foot condition.
13. Plaintiff has not proven that she developed an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed.
14. Plaintiff has not proven that her disability was causally related to her employment with defendant-employer.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff's plantar fasciitis was not an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed. N.C. Gen. Stat. §97-53(13); Booker v. Duke Medical Center, 297 N.C. 458 (1979).
2. Plaintiff has not proven a causal relationship existed between plaintiff's employment with defendant-employer and her plantar fasciitis.Brown v. J.P. Stevens Co., 49 N.C. App. 118 (1980), cert. denied,304 N.C. 192 (1981).
3. Plaintiff is not entitled to benefits under the Workers' Compensation Act. N.C. Gen. Stat. § 97-2 et seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. This claim must, under the law, be and it is hereby DENIED.
2. The parties shall share the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER